2372-001

DeOrchis, Wiener & Partners, LLP
61 Broadway, 26th Floor
New York, NY 10006-2802
(212) 344-4700

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARIA MARGHERITA PERACCHINO, and
MEDIAPRESS S.R.L.,

                      Plaintiffs,

     -against-

VINCENZO MARRA and
JOHN DOE COMPANY,

                      Defendants.
------------------------------------------------------------X

**COMPLAINT**

      Plaintiffs MARIA MARGHERITA PERACCHINO ("PERACCHINO") and MEDIAPRESS S.R.L. ("MP"), through their attorneys DeOrchis, Wiener & Partners, LLP, allege upon information and belief as follows for their Complaint against Defendants VINCENZO MARRA ("MARRA") and JOHN DOE COMPANY:

## COMMON ALLEGATIONS

      1.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332(2) because this action is between foreign parties, Plaintiffs, and citizens of the State of New York, Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

      2.    Venue properly lies in this District because Defendants reside or do business in this District.

3. At all times herein mentioned, Peracchino is an individual with an address at v. Vische 7, Candia Canavese, Italy.

4. At all times herein mentioned, MP was and still is a business entity organized and existing under the laws of Italy with a place of business at v. Montechiaro 1, Barone Canavese, Italy.

5. Upon information and belief, Marra is an individual and, at all times herein mentioned, was and still is residing in this District and was and still is conducting business in this District, at 232 Madison Avenue, New York, New York 10016. Marra was and still is the controller, shareholder, officer and/or director of the John Doe Company ("John Doe").

6. Upon information and belief, at all times herein mentioned, John Doe was and still is a business entity existing under the laws of a State. At all relevant times, John Doe was and still is conducting business within this District.

7. Plaintiffs bring this action on their own behalf and as agents and/or trustees on behalf of and for the interest of all parties who may be or become interested in the said action, as their respective interests may ultimately appear, and Plaintiffs are entitled to maintain this action.

## FACTS

8. Peracchino is a shareholder, officer and director of MP. MP is a company which through its press agency News Italia Press ("NIP") divulges news of various nature to and about the "Italian world" which is made of Italians who reside outside of Italy, as well as Italian-Americans. MP also organizes events for or in connection with the "Italian world". MP has been in business for over ten years.

9. Marra orchestrated and directed a complex scheme which involved people and entities with a specific role which at all relevant times appeared, disappeared and reappeared at their convenience and which, ultimately, nearly bankrupted and destroyed the Plaintiffs.

10. In 2004, MP was undergoing a project of renovation and restructuring which would enable MP to strengthen its position in Italy and in the U.S.

11. Plaintiffs' problems with Defendants started on August 14, 2004 when Peracchino, individually and on behalf of MP, met with Marra in Rome, Italy, in order to discuss MP's project and, ultimately, propose to Marra to invest in MP. At the meeting, Peracchino asked if Marra was interested in investing in MP and in finding other investors. Marra responded that he was interested in investing in MP. Marra also indicated that Peracchino should talk to his financial consultant who is in charge of these types of investment. Marra indicated that that person would be Paolo Zinni, an individual residing in Milan, Italy.

12. Thereafter, Marra arranged for a meeting between Peracchino and Zinni at Zinni's Milan office. During the meeting with Zinni in September 2004, Zinni indicated that he wanted to review MP's business plan.

13. Peracchino, then, hired a business consultant to prepare a business plan to submit to Zinni. MP's business plan cost approximately $12,000.

14. Thereafter, Peracchino and Zinni met several times to define the terms of the investment. During said meetings, Zinni insisted that Plaintiffs meet with Riccardo Piana ("Piana"), Zinni's marketing consultant. Piana then visited MP's offices, reviewed MP's services and their marketing needs, and concluded that MP's services were palatable both in

Italy and the U.S. According to Piana, MP needed to spend some money to improve its marketing strategy, and MP's services in general.

15. After Plaintiffs' meeting with Piana, at the end of February or beginning of March 2005, Zinni informed Peracchino that he would start the investments into MP by wiring, on or about April 10 or 11, 2005, Euros 150,000 (approximately $210,000) to Peracchino who, as a shareholder of MP, would then transfer the wired funds to MP as a shareholder's loan to the corporation (MP).

16. At the same time, Piana requested that Plaintiffs pay him Euro 5,000 to commence marketing MP's services. Once Plaintiffs paid Piana, Piana disappeared.

17. On or about April 11, 2005, Zinni confirmed that the funds had been wired. Notwithstanding Zinni's confirmation, since Plaintiffs had not received said funds, Plaintiffs requested that Zinni show them a copy of the wire transfer. On April 28, 2005, Zinni sent Plaintiffs an email allegedly attaching a copy of the wire transfer.

18. When Plaintiffs showed a copy of the alleged wire transfer to the receiving bank, the receiving bank informed Plaintiffs that the wire transfer receipt was a forgery and that no funds were ever wired. When Plaintiffs confronted Zinni, Zinni replied that his employee or agent had stolen the funds and left town.

19. Zinni then issued a personal check for Euro 150,000 to Peracchino.

20. During this entire time, Marra was daily informed on the status of the investments in MP, the problems in receiving the funds, and the fact that Zinni had issued a personal check. On several occasions, on the phone, in late Spring 2005, Marra commented

that even if it was Zinni's personal check, it was really Marra's money and that it was he who was ultimately paying.

21. When Plaintiffs attempted to deposit said check, they discovered that there were no funds in Zinni's accounts (and the check bounced).

22. Peracchino then explained to Marra that the check had bounced and Marra indicated that he would resolve the problem directly with Zinni.

23. As part of his effort, at the beginning of Summer 2005, Marra promised Plaintiffs that he would get more personally involved by investing his own money and also money of other investors with which he did business.

24. Pursuant to his promise, Marra sent another financial advisor, Giovanni Vasapollo ("Vasapollo") to MP's office to examine MP again. After the okay by Vasapollo, Marra introduced Plaintiffs to his partner, Walter Toccafondi ("Toccafondi"), who would also invest into MP.

25. Pursuant to Plaintiffs' talks with Marra and Toccafondi, Plaintiffs invited at their expense, Marra and Toccafondi to Turin, Italy, where Marra and Toccafondi met with MP's employees.

26. While in Turin, Marra announced to MP's employees that "that rest assured, after so many words, now our [Marra's and Toccafondi's] money is coming". They would finally invest in MP.

27. After meeting with another financial advisor, who was allegedly Toccafondi's advisor, Plaintiffs were informed that a new problem occurred. Toccafondi was allegedly in a hospital due to his diabetes.

5

28. In the meantime, relying on Marra's and Toccafondi's numerous assurances and promises that money was coming very soon, Plaintiffs commenced spending money (MP hired an executive and rented a bigger office space) with the knowledge, approval, and continuous assurance of Marra. It was Marra who specifically invited Plaintiffs to arrange as soon as possible for the hiring of the executive, the renting of a bigger officer space, and in general the set-up of a new commercial structure.

29. Since Toccafondi was allegedly ill, Plaintiffs asked Marra to get involved personally. Marra indicated that he also was stuck in New York due to business reasons and suggested that Plaintiffs meet Giuliano Michelucci, another of his trusted representatives or associates.

30. Marra organized a meeting with Michelucci and his accountant at the office of said accountant in Milan, Italy, on or about November 2, 2005.

31. Plaintiffs later found out that Michelucci was Marra's "fact totum" and even driver.

32. At the November meeting, Michelucci confirmed that he would conduct the investment deal on behalf of Marra. He also proposed that Plaintiffs involve Armando Miccoli, another businessman he trusted. Marra approved.

33. Thereafter, even Miccoli suddenly disappeared after he had allegedly attempted to find additional potential investors. When Plaintiffs communicated to Marra that Miccoli had disappeared, Marra invited Plaintiffs to continue working with Michelucci.

34. In the meantime, MP decided to organize an event in Montecarlo, Europe, as part of MP's services.

6

35. In order to be able to pay for the cost of the event, MP, once again, was in need of an investor, especially since lots of MP's financial resources had been spent due to Marra and his entourage.

36. Again, Michelucci, on behalf of Marra, indicated that he would involve certain financial institutions, located in the Republic of San Marino, in the transaction.

37. Michelucci then assured Plaintiffs that said financial institutions were interested and that they would help MP with the cost of the event. Relying on Michelucci's representations and Marra's approval, MP commenced organizing the event.

38. Michelucci introduced Plaintiffs to Sergio Lupi ("Lupi"), an alleged accountant who "represented" one of said financial institutions. It was Lupi who called the organizers of the event to confirm that by no later than April 25, 2006, the financial institutions would wire the sum of Euro 320,000 (more than $400,000) to MP. Lupi then insisted that Plaintiffs cover the initial cost of the event, while the funds were forthcoming. Relying on such assurances, Plaintiffs issued check and spent money to cover such initial costs.

39. The promised funds were never sent and the check issued by the Plaintiffs bounced. Lupi disappeared.

40. Michelucci was informed of the problem and, on or about May 17, 2006, he instructed Plaintiffs to contact the financial institution's executives.

41. On May 18, 2006, Plaintiffs met with said executives in San Marino and were promised that the funds would be wired within 4 days.

7

42. Since again, no funds were received, on May 25, 2006, Plaintiffs informed Michelucci and Marra that if MP did not receive the funds immediately, the event would fall apart and MP would be bankrupt.

43. On May 26, a person named Silvia who allegedly worked for a bank in San Marino called Plaintiffs to communicate the details to trace three wire transfers (out of allegedly 5 transfers that Michelucci had promised to make). The three wires, allegedly amounted to a total of Euros 97,405 (equal to approximately $125,000). According to Michelucci, the balance (checks) would be handed to Plaintiffs at San Marino on May 27. However, Plaintiffs were never invited to San Marino on May 27.

44. On May 29, 2007, Plaintiffs were informed that the three wire transfers did not exist and that the details that were communicated by Silvia did not exist.

45. When Plaintiffs spoke with Michelucci, Michelucci insisted that the funds would come shortly, which they never did.

46. To save MP from bankruptcy and the event, Peracchino was forced to sell her family's properties. This notwithstanding, the event fell apart, because Peracchino's money was not sufficient to cover all costs.

47. In the meantime, MP organized a minor, less expensive, event in Monte Carlo. In July and August 2006, Plaintiffs spent approximately Euro 150,000.

48. By reason of the foregoing, Plaintiffs have suffered damages in excess of $1,000,000, including damages to the core business and reputation of MP which was on the verge of total collapse.

## COUNT I
## AS AND FOR A FIRST CAUSE
## OF ACTION FOR BREACH OF CONTRACT AS AGAINST
## ALL DEFENDANTS

49. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

50. The promises of Defendants and the acceptances of Plaintiffs constitute valid contracts between the parties herein. Plaintiffs performed their obligations while Defendants failed to perform their obligations. Defendants' failures to perform amount to breaches of contracts. By reason of the foregoing, Plaintiffs suffered damages.

## COUNT II
## AS AND FOR A SECOND CAUSE OF ACTION
## FOR PROMISSORY ESTOPPEL AS AGAINST
## ALL DEFENDANTS

51. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

52. Defendants made several promises to Plaintiffs. Plaintiffs relied on each promise made to them by Defendants. Defendants failed to keep their promises. Defendants' failures damaged the Plaintiffs.

## COUNT III
## AS AND FOR A THIRD CAUSE OF ACTION
## FOR EQUITABLE ESTOPPEL AS AGAINST
## ALL DEFENDANTS

53. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

54. Defendants made several promises to Plaintiffs. Plaintiffs relied on each promise made to them by Defendants. Defendants failed to keep their promises. Defendants' failures damaged the Plaintiffs.

## COUNT IV
## AS AND FOR A FOURTH CAUSE OF ACTION
## FOR FRAUD AS AGAINST ALL DEFENDANTS

55. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

56. Defendants made several promises to Plaintiffs. Plaintiffs justifiably relied on each promise made to them by Defendants. Defendants failed to keep their promises. Defendants' failures damaged the Plaintiffs.

## COUNT V
## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENTATION AS AGAINST ALL DEFENDANTS

57. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

58. Defendants made several promises to Plaintiffs. Plaintiffs justifiably relied on each promise made to them by Defendants. Defendants failed to keep their promises. Defendants' failures damaged the Plaintiffs.

## COUNT VI
## AS AND FOR A SIXTH CAUSE OF ACTION FOR UNJUST ENRICHMENT AS AGAINST ALL DEFENDANTS

59. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

60. Defendants' actions and or omissions enriched Defendants. Defendants' enrichment was not justified. Defendants received benefits from Plaintiffs which they accepted.

## COUNT VII
## AS AND FOR A SEVENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY AS AGAINST ALL DEFENDANTS

61. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

62. Defendants had superior knowledge respect to Plaintiffs of all facts and circumstances described herein. Defendants had a duty of care and loyalty to the Plaintiffs. Defendants breached said duty to Defendants in light of their actions and/or omissions. By reason of Defendants' breach, Plaintiffs suffered damages.

## COUNT VIII
## AS AND FOR A EIGHTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACTS AS AGAINST ALL DEFENDANTS

63. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

64. Plaintiffs had stipulated contracts for the hiring of an executive, the renting of larger office space, the organization of events. Defendants interfered with said contracts. By reason of the foregoing, Plaintiffs suffered damages.

## COUNT IX
## AS AND FOR A NINTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE AS AGAINST ALL DEFENDANTS

65.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

66.     Plaintiffs had expectations of business advantages due to their long-lasting relations with clients and potential clients.  Defendants interfered with Plaintiffs' relations.  By reason of the foregoing, Plaintiffs suffered damages.

## COUNT X
## AS AND FOR A TENTH CAUSE OF ACTION FOR PUNITIVE DAMAGES AS AGAINST ALL DEFENDANTS

67.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 48 of this Complaint as if herein set forth at length.

68.     Plaintiffs are entitled to recover punitive damages due to Defendants' willful and/or malicious actions and/or omissions.  Defendants' conduct was repetitive and continuous which makes their conduct even more despicable and subject to punitive damages.  Defendants' conduct not only caused monetary damages to the Plaintiffs but also drove the Plaintiffs to near bankruptcy.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants on each and every cause of action herein in an amount in excess of $1,000,000, plus interest, costs and

fees of this action, including but not limited to attorneys' fees, as well as such other and further relief that this Court may deem just and proper.

Dated: April 23, 2007
       New York, NY

                                  DeOrchis, Wiener & Partners, LLP
                                  Attorney for Plaintiffs

By: _____
     Francesco Di Pietro (FD 6383)
     61 Broadway, 26th Floor
     New York, New York 10004-1480
     (212) 344-4700
     Our File: 2372-001

TO:    Vincenzo Marra
         232 Madison Avenue
         New York, New York 10016

         John Doe Company
         232 Madison Avenue
         New York, New York 10016

W:\2372-001\Legals\Complaint 042307 Fdp.Doc 4/23/07-np[o