UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X

MARIA MARGHERITA PERACCHINO and
MEDIAPRESS S.R.L.,                           Civ. Action No.
                                             07 Civ. 3257 (LTS)
                    Plaintiff,

          -against-
VINCENZO MARRA and
JOHN DOE COMPANY,

                    Defendants.

--------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT

          Defendants VINCENZO MARRA ("Marra") and JOHN DOE COMPANY
submit this Memorandum of Law in support of their motion to dismiss
the Amended Complaint (the "Amended Complaint") of Plaintiffs, MARIA
MARGHERITA PERACCHINO ("Peracchino") and MEDIAPRESS S.R.L., ("MP")
pursuant to Rules 12(b)(3) and 12(b)(6) of the Fed. R. Civ. P.

Preliminary Statement

          Plaintiffs have served an Amended Complaint which provides
no plausible basis for a court to determine that they are entitled to
relief under any of its ten counts.  Furthermore, the Amended
Complaint's averments place substantially all events, witnesses and
documents in Europe, with the only nexus to this venue being the
domicile of Marra, the undisclosed and unconnected business of John
Doe Company and unspecified communications between Marra and unnamed
parties in Europe purportedly while Marra was in New York.  For both

reasons, the Amended Complaint should be dismissed.

## SUMMARY OF THE AVERRED FACTS

A.    The Parties To This Action.

Plaintiff, Peracchino, is averred to be an "an individual" with "an address at v. Vische 7, Cardia Canavese, Italy." ¶4[1].

Plaintiff, MP is averred to be "a business entity" organized and existing under the laws of Italy with "a place of business at v. Montechiaro 1, Barone Canavese, Italy." ¶4.  MP conducts a business working through a press agency called News Italia Press which divulges news about the "Italian world" of expatriate Italians and organizes events in unspecified places within the "Italian world."  ¶8.

Defendant, Marra is averred to be an individual domiciled in this District ". . .and was and still is conducting business in this District, at 232 Madison Avenue, New York, New York 10016." ¶5.

Defendant, John Doe Company, is averred to be

> "a business entity existing under the laws of a State.  At all relevant times, John Doe was and still is conducting business within this District."

This is the last substantive mention of John Doe Company in the entire Amended Complaint.

---

[1]The reference is to the paragraphs of the Amended Complaint, Exhibit __ to the affidavit of Leo Kayser, III, sworn to July   , 2007, submitted with the Notice of Motion.

B.    <u>The Amended Complaint's Averments</u>

        Plaintiffs aver that "Marra orchestrated and directed a complex scheme which involved people and entities with a specific role which at all relevant times appeared, disappeared and reappeared at their convenience and which, ultimately, nearly bankrupted and destroyed the Plaintiffs."  ¶9.  The first contact averred between Plaintiffs and Marra occurred at a meeting on August 14, 2004, in Rome, Italy "to discuss MP's project and, ultimately propose to Marra to invest in MP." ¶11.  The Amended Complaint is silent as to whom initiated the meeting.  The Amended Complaint acknowledges that one objective of Plaintiffs was to enlist the assistance of Marra "in finding other investors".  ¶11.  According to the Amended Complaint, Marra "responded that he was interested in investing in MP".  ¶11.  Mara is also averred to have "indicated that Peracchino should talk to his financial consultant who is in charge of these types of investments", a person named Paolo Zinni, who resided in Milan, Italy.  ¶11.  The Amended Complaint avers that Marra "arranged for a meeting between Peracchino and Zinni at Zinni's Milan office." ¶12

        At the time Peracchino first met Zinni in Milan, Plaintiffs did not have a business plan, ¶¶11-12, since Peracchino avers she hired "a business consultant to prepare a business plan to submit to Zinni" at a cost of $12,000. ¶13.

        Peracchino and Zinni are averred to have met several times "to define the terms of the investment." ¶14.  Zinni, whose only connection so far averred to Marra is that Marra introduced Zinni to

3

Plaintiff, "insisted that Plaintiffs meet with a Riccardo Piana, Zinni's marketing consultant."  ¶14.

The Amended Complaint avers that at the end of February 2005 or beginning of March 2005,

> "Zinni informed Peracchino that he [Zinni] would start the investments into MP by wiring, on or about April 10 or 11, 2005, Euros 150,000 ... to Peracchino who, as a shareholder of MP, would than transfer the wired funds to MP as a shareholder's loan to the corporation (MP)." ¶15.

The Amended Complaint does not aver any agreement to "wire" the funds, what consideration Defendants agreed to provide for the "wire" or whether any writing was created to memorialize any agreement to make the "wire".

The Amended Complaint also avers that Plaintiffs paid Piana for "marketing MP's services" the sum of Euros 5,000, who thereafter "disappeared".  ¶16.

The Amended Complaint contains no specific averment that Marra had any knowledge of the Piana transaction, but states broadly that "Marra was daily informed on the status of the investments in MP, the problems in receiving the funds and the fact that Zinni had issued a personal check." ¶20.  The Amended Complaint fails to disclose where the parties were when Marra was averred to be informed, who did the informing or why Marra was informed.  The Amended Complaint avers, that "Marra commented that even if it was Zinni's personal check, it was really Marra's money and that it was he who was ultimately paying" (Emphasis added) ¶20, but does not aver that Marra actually was

4

responsible for making the investments being discussed. No explanation is averred as to why Marra would make such a "comment" or what the significance that such "comment" had.

Peracchino "explained" to Marra that a check Zinni is averred to have given to Peracchino in Italy, ¶19, had bounced, ¶22, and Marra is averred to have "indicated" that he would "resolve the problem directly with Zinni." ¶22. Marra "promised" in early summer 2005 to ". . . get more personally involved by investing his own money and also the money of other investors ...", ¶23, and pursuant to such promise, sent another financial advisor, Giovanni Vasapollo to MP's office to examine MP again, which led to Marra's introducing Plaintiffs to "his partner" Walter Toccafondi, who "would also invest" in MP. The basis for ascribing Toccafondi as Marra's "partner" appears to be predicated solely upon a general averment of a so-called partnership interest held by Toccafondi's "in at least one U.S. corporation or entity located in New York." ¶24.

Thereafter, Marra and Toccafondi went to Turin, Italy to meet with MP's employees, ¶25, and assured the employees "our money is coming", ¶26, and they would finally invest in MP. ¶26. The Amended Complaint fails to aver that any actual agreement existed to invest, averring no terms, no amount of investment, no description as to how it would be made or description of what the consideration would be, though the promise was subsequently confirmed on several occasions. ¶26.

The gravamen of Plaintiff's Amended Complaint is that they

relied upon "Marra's and Toccafondi's numerous assurances and promises that money was coming very soon" by "spending money" to hire an executive, rent a bigger office and set up a new commercial structure, for which Plaintiffs were "... unable to meet their contractual obligation." ¶28. This was Mara's fault because he not only had knowledge of, but actually gave his "approval" to what Plaintiffs were committing themselves. ¶28 The Amended Complaint does not aver that the approval was in writing or how actually it was given or to whom. In fact, the Amended Complaint does not aver that Plaintiffs' reliance was reasonable, an essential element of any promissory estoppel claim.

Toccafondi apparently lost interest in the transaction due to an illness or otherwise ¶¶27, 29. Marra then referred Plaintiffs to "another of his trusted representatives or associates", Giuliano Michelucci ¶29, which met at the office of Michelucci's accountant, with Michelucci in Milan, Italy on November 2, 2005, who turned out to be Mara's driver ¶31, but "confirmed he would conduct the investment deal on behalf of Marra" and who suggested that "Plaintiffs involve Armando Miccoli, another businessman he [Michelucci] trusted", which Marra approved. ¶32

But Miccoli also "disappeared" after attempting to find additional potential investors. ¶33 The Amended Complaint couches Marra "from New York" as being "always aware of the situation" and as having "kept orchestrating schemes to the detriment of Plaintiffs". ¶33.

In the meantime, sometime later MP, having decided to organize an event in Monte Carlo, ¶34, still was in need of investors, since "lots" had been spent by MP "due to Marra and his entourage." ¶25.

Michelucci, on behalf of Marra, "indicated" he would "involve" certain financial institutions in the Republic of San Marino. ¶36. Plaintiffs this time relied upon Michelucci's assurances that these unnamed financial institutions were interested in helping MP in some unspecified way with the cost of the event. ¶37. Michelucci then proceeded to introduce Plaintiffs to Sergio Lupi, who confirmed that the unnamed financial institutions would wire Euros 320,000 to MP. Because Lupi was held out as an accountant who represented one of the financial institutions and had "insisted that Plaintiffs cover the initial cost of the event, Plaintiffs "issued [a] check and spent money," both in unspecified amounts. ¶38. The funds were never sent and Lupi, then, disappeared. ¶39. No where does the Amended Complaint aver that Plaintiffs' reliance on Lupi was reasonable.

Plaintiffs continued to meet with the financial institutions through Michelucci, going so far as to meet with "executives" of one institution in San Marino, who also "promised that the funds would be wired within 4 days." ¶41. When the funds were not forthcoming as of May 25, 2006, Plaintiffs informed Michelucci and Marra that if funds were not received immediately the event would fail and MP would be bankrupt. ¶42.

Silvia, who allegedly worked for "a bank in San Marino" called to trace three wires totaling Euros 97,405, with Mihcelucci indicating the balance would be delivered by hand on May 7, at San Marino, none of which ever occurred. ¶¶43-45. Instead, Peracchino was forced to sell her family's properties for an unspecified amount of money to save MP from bankruptcy, but the event "fell apart" for insufficient funding. ¶46. Another, less expensive event, did occur in Monte Carlo in July - August 2006, which cost Euros 150,000. ¶47.

Plaintiffs claim damages in excess of $1,000,000, because of their loss of reputation and injury to MP's business. ¶48.

### POINT I

### THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Rule 8(a)(2) of the Fed.R.Civ.P. requires that any pleading which sets forth a claim for relief must contain;

> ". . . a short and plain statement of the claim showing that the pleader is entitled to relief . . ."

The United States Supreme Court has very recently revisited in <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955 (2007) the Rule 8(a) pleading standard holding that the bare pleading of an agreement was insufficient. Specifically, the Court stated:

> "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement

of the claim showing that the pleader is entitled to relief'; in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests', <u>Cosley v. Gibson</u>, 355 U.S. 41, 47 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does <u>not</u> need detailed factual allegations, <u>ibid.</u>; <u>Sanjeran v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (CA 7 1994), a <u>plaintiff's obligation</u> to provide the grounds of his 'entitle[ment] to relief <u>requires more than labels and conclusions and a formulaic recitation</u> of the elements of a cause of action <u>will not do</u>, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'). Factual allegations must be enough to raise a right to relief above the speculative level, see SC. Wright & A. Miller, Federal Practice and Procedure §1216, pp.235-236 (3d ed. 2004) (hereinafter Wright and Miller) ('[T]he pleading must contain something more ... than ... a statement of facts that merely create a suspicion [of] a legally cognizable right of action'), on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . ."

"In applying these general standards ..., we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest an agreement was made. . . ."

. . .

"The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement <u>reflects the threshold requirement of Rule 8(a)(2)</u> that the 'plain statement' reflect enough heft to 'sho[w] that the pleader is entitled to relief' ..." <u>Id</u>. at pp. 1964-1965 (Emphasis

added.)[2]

In footnote 3, the Court elaborates:

> ". . . Rule 8(a)(2) still requires a 'showing', rather than a blanket assertion, of entitlement to relief. <u>Without some factual allegations in the complaint</u>, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim but also 'grounds' on which the claim rests. <u>See</u> 5 Wright & Miller §7202, at 94, 95 (Rule 8(a) 'contemplate[s] the <u>statement of circumstances, occurrences and events</u> in support of the <u>claim</u> presented' and does not authorize a pleader's '<u>bare</u> averment that he wants relief and is entitled to it') . . ." <u>Id</u>. at p.1965.

## ANALYSIS OF THE COUNTS IN THE AMENDED COMPLAINT

A.  <u>COUNT I</u>

Count I's claim for breach of contract fails to plead facts showing the actual existence of a contract, leaving the reader of the Amended Complaint with nothing more than a "shaggy dog story" of events, which when concluded, provide no notice of any averred mutuality of obligation and/or essential terms required to determine the formation of a contract. Plaintiffs' Amended Complaint is "bare" of any factual averments providing fair notice of any agreement

---

[2]While <u>Twombly</u> pertains to certain special concerns relating to their being an actual agreement, rather than mere parallel actions, in the context of §1 of the Sherman Act, these distinctions do not make a serious difference from general Rule 8(a) pleading analysis. <u>See</u> the dissent in <u>Twombly</u> at p.1988:

> "Whether the Court's actions will benefit only defendants in anti-trust treble-damage cases or whether its test for sufficiency of a complaint will innure to the benefit of all civil defendants is a question that the future will answer."

claimed by Plaintiffs for the Defendants' investing funds in the Plaintiffs' business. Wrightman-Cervantes v. ACLU, 2007 WL 1805483 (S.D.N.Y.) p.2.

Under New York law a valid contract requires an offer, acceptance, consideration and mutual assent and intent to be bound. Teachers Ins. and Annuity Association of America v. Tribune Co., 610 F.Supp. 491, 497 (S.D.N.Y. 1987), wherein the Court stated:

> "It is fundamental to contract law that mere participation in negotiations and discussions does not create [a] binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is overall agreement (offer and acceptance) to enter into the binding contract."

Accord Rosenblatt v. Christie, 195 F.3rd 22(2d Cir. 2006). In the case at bar there is no cognizable offer, acceptance, agreed upon terms and conditions, or performance. Winston v. MediaFare Entertainment Corporation, 777 F.2d 78, 80-81 (2d Cir. 1986). The Amended Compliant does not aver any expression of mutual consent to be bound or an act, conduct or performance that manifests consent to be bound. Reprosystem, B.V. v. SCM Corporation, 727 F.2d 257, 261-262 (2d Cir. 1984), cert denied 469 U.S. 828 (1984). What did John Doe Company do at all? What did either Plaintiff promise to give to Marra? Were the funds averred to have been promised by way of equity or debt? If equity, did Peracchino promise that MP would be issuing stock or some other form of equity, and if so, what percentage of economic interest? What were the arrangements with respect to issues

11

of control?  What protections were negotiated for the investor?  If debt, what was the terms for repayment?  What interest rate was agreed upon by the parties?  What protection existed in the event of default?

The Amended Complaint is silent on these crucial issues. The Amended Complaint avers no meeting of the minds as required for a contract to exist.

B.    COUNT II

Count II of the Amended Complaint purports to assert a claim for promissory estoppel as against "all defendants".

To establish a claim for promissory estoppel under New York law, Plaintiffs must establish three elements:

1.    a clear and unambiguous promise;

2.    reasonable and foreseeable reliance by the promisee; and

3.    unconscionable injury to the promisee as a result of their reliance.

Readco, Inc., v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996).

These elements are not met in the Amended Complaint.  That the averred promises to invest money are in a commercial context makes Plaintiffs' purported reliance on such promises, outside of an actual enforceable agreement, unreasonable.

> "Furthermore, [b]ecause casual statements and contacts are prevalent in business, liability in the commercial context is imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Eternity Global Master Fund,

Ltd. v. Morgan Guarantee Trust Co., 375 F.2d
168, 187-188 (2d Cir. 2004).[3]

See also, R.G. Group Inc. v. Horn & Hardart Co., 751 F.2d 69, 78-79
(2d Cir. 1984), wherein the Second Circuit concurred with the district
court's conclusion that plaintiff's claimed expenditures were made in
expectation rather than in reliance of any claimed promised.

No where in Count II do Plaintiffs aver that their reliance
on the purported promises to invest was reasonable, which makes Count
II's claim of promissory estoppel fatally flawed.  Reprosystem, B.V.
v. SCM Corp, 727 F.2d 257, 265 (2d Cir. 1984).

Even if Count II had averred in conclusory language that
Plaintiffs' reliance had been reasonable, in the context of the facts
averred by Plaintiffs, such conclusions would not have been
sufficiently plausible to pass the test set forth in Bell Atlantic
Corp v. Twombly, supra pp. 8-10. Cf. S.Q.K.F.C., Inc. v. Bell Atlantic
Tricon Leasing Corporation, 84 F.3d 629, 636-637 (2d Cir. 1996),
stating a reasonable consumer would not have been misled.

C.    COUNT III

Count III avers the claim of equitable estoppel.  Under New
York law to establish equitable estoppel, the plaintiff must establish
that:

1.    Defendants engaged in conduct which amounts to false
      representation or concealment of material facts;

---

[3]The logic as applied to the tort of negligent misrepre-
sentation is the same as for promissory estoppel.

2.    Defendants actually intended that such conduct would
be acted upon by the plaintiff; and

3.    Defendants knew the real facts;

as well as lack of knowledge of the true facts; reliance upon the
conduct of the party estopped; and a prejudicial change of position.
Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301-302 (2d Cir.
1996).

Equitable estoppel thus requires the essential element that
Defendants intended Plaintiffs to do whatever it is they did based
upon Defendants' representation to plaintiffs.    Southern Federal
Savings & Loan Association v. 21-26 East 105th Street Associates, 146
B.R. 375, 381-383 (S.D.N.Y. 1991) aff'd. 978 F.2d 705 (2d Cir. 1992).
No such intent is averred, nor is any motive averred that would give
rise to any such intent. Since equitable estoppel also requires an
averment that any reliance be reasonable, id at 381, Count III fails
for the same reason as Count II.

D.    COUNT IV

Count IV avers a claim for fraud.  The elements of common
law fraud are:

1.    a material, false representation;

2.    an intent to defraud thereby;

3.    reasonable reliance on the representation;

4.    causing damage to the plaintiff.

Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999).  To plead this
fraud claim, Plaintiffs must specify the circumstances of the fraud

14

"with particularity" (Fed.R.Civ.P. 9(b)) and must allege facts that
give rise to a strong inference of a fraudulent intent.  Shields v.
Citytrust Bancorp Inc., 25 F.3d 1129, 1127-1128 (2d Cir. 1994). The
Amended Complaint fails to aver any motive for why Marra would have
intended to defraud Plaintiffs, since neither he nor the John Doe
Company are averred to have received anything of value from
Plaintiffs.

Since fraud also contains the element of reasonable reliance
by Plaintiffs on specific misrepresentations made by Defendants with
the intent to defraud, Count IV baldly states in conclusory language
that Plaintiffs "justifiably relied on each promise made to them by
Defendants".  However, as pointed out under the discussion relating
to Count II's promissory estoppel, Plaintiffs' reliance could not
plausibly have been reasonable in the context averred by Plaintiffs
in the Amended Complaint.

Furthermore, since the averment of fraud requires greater
specificity under Rule 9 of the Fed.R.Civ.P., the Amended Complaint
is sorely deficient with respect to meeting such Rule 9 standard.  The
Amended Complaint should break out the time, place, and/or name of
each promise made by Marra, the fact he had the specific intent when
each statement was made that he knew it to be untrue and that it was
made with the intent to separate Plaintiffs from something of value
which would inure to his benefit.  The Amended Complaint does not aver
any of this, but describes an unactionable effort over a period of
about three years to assist Plaintiffs to find some money for MP's

15

operations.

E.    <u>COUNT V</u>

        Count V attempts to state a claim for negligent misrepresentation, which again contains the wholly conclusory averment that Plaintiffs "justifiably relied on each promise made them by Defendants." However, under New York law negligent misrepresentation mandates that there be a duty on the defendant to exercise reasonable care in giving information to Plaintiffs. Also, for reasons stated in discussion under Count II, promissory estoppel and Count IV, fraud, it is not plausible that Plaintiffs' purported reliance was reasonable. <u>Heard v. City of New York</u>, 82 N.Y.2d 66, 73-75 (1993). <u>Hydro Investors, Inc. v. Trafalgar Power Inc.</u>, 227 F.3d, 20-21 (2d Cir. 2000). The Amended Complaint also fails to state a claim for negligent misrepresentation because the averred misrepresentations related to future events which are promissory in nature rather than factual. <u>Id</u>. at 21-22.

F.    <u>COUNT VI</u>

        Count VI avers a claim for unjust enrichment. A claim for unjust enrichment shall only lie where the defendant received money or some other benefit which in equity and good conscience the defendant should not retain because it belongs to the plaintiff. <u>Indyk v. Habib Bank, Ltd.</u>, 694 F.2d 54, 57 (2d Cir. 1982). While the Amended Complaint states that Defendants were "enriched" by their "actions and/or omissions" ¶60, no where in the Amended Complaint is any benefit and/or enrichment obtained by Marra or John Doe Company

16

averred.  The bald statement that Defendants were enriched does not even provide Defendants with fair notice as to what the Amended Complaint avers.  How were Defendants enriched?

Count VI fails to state a claim upon which relief can be granted and should be dismissed.  Martes v. U.S. Life Corp., 927 F.Supp. 146, 149 (S.D.N.Y. 1996).

G.  COUNT VII

Count VII avers a claim for breach of fiduciary duty, which consists exclusively of conclusory language about Defendants' having used unspecified superior knowledge with respect to Plaintiffs in some unspecified respect and that Defendants had for some unspecified reason "a duty of care and loyalty to Plaintiffs".  The Amended Complaint nowhere avers what relationship existed between Plaintiffs and Defendants which should give rise to a fiduciary duty.  Under New York law, in order to state a claim for breach of fiduciary duty, Plaintiffs must aver three elements:

1.    the existence of a fiduciary relationship;

2.    knowing breach of a duty that the relationship imposes; and

3.    damages suffered.

Carruthers v. Flaunn, 388 F.Supp.2d 360,381(S.D.N.Y.2003). The Amended Complaint does not aver that Marra had any specified relationship giving rise to Plaintiffs' being able reasonably to repose special confidence in Defendants.

Since no averment of a fiduciary relationship is contained in the Amended Complaint, Count VII fails to state a claim upon which

relief may be granted.

H.    COUNT VIII

Count VIII of the Amended Complaint claims that Defendants tortuously interfered with contracts which the Plaintiffs purportedly had.  Under New York law to establish the elements of tortuous interference with contract the Plaintiffs must aver:

1.    the existence of a valid contract between the Plaintiffs and a third party;

2.    the Defendants' knowledge of the contract;

3.    the Defendants' intentional procurement of the third-party's breach of the contract without justification;

4.    an actual breach of contract; and

5.    damages as a result thereof.

Lama Holdings Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 424 (1996), holding that a claim for tortuous interference with a contract fails when no allegation is made of an intentional procurement of a contract breach.  The contracts that purportedly were affected by Defendants purported interference related to Plaintiffs' having executed contracts for having an executive, for renting a larger office space, and a contract for organization of events, ¶64, and the Amended Complaint makes no averment that Defendants intentionally procured a breach of the agreement.

The Amended Complaint in wholly conclusory language avers that Defendants "interfered with said contracts".  Even assuming that Defendants had knowledge of the contracts, the Amended Complaint fails

to provide any notice as to how Defendants purportedly interfered. In the case at bar, the only thing the Amended Complaint avers is the fact that Defendants did not invest in Plaintiffs' business.  Such a failure, even if, itself, were a breach of a contract, does not state a claim for tortuous interference with contracts. Failure to allege all of the necessary elements of a tortuous interference with contract claim shall lead to dismissal of the claim.  <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 401-402 (2d Cir. 2006).  Plaintiffs do not aver that any third party breached any contract with Defendants due to Plaintiffs' procurement of such breach.

I.   <u>COUNT IX</u>

     Count IX avers a claim for tortuous interference with economic advantage.  Under New York law, to state a claim for tortuous interference with prospective economic advantage, the Plaintiffs must plead the following:

1.   that Plaintiffs had a business relationship with a third party;

2.   the Defendants knew of that relationship and intentionally interfered with it;

3.   that Defendants acted solely out of malice, or used dishonest, unfair or improper means; and

4.   that Defendants' interference caused injury to the relationship.

This claim is faulty for the same reason discussed under Count VIII above as well as the fact that the Amended Complaint nowhere pleads

19

point 3 above.  <u>Kirch v. Liberty Media Corp.</u>, <u>supra</u> at p.400.

J.    <u>COUNT X</u>

Count X purports to state a "claim" for punitive damages. However punitive damages is not itself a cognizable claim, but attaches only if the Amended Complaint avers a claim upon which relief may be granted of the nature that qualifies part of that relief to constitute punitive damages.  Since not one of the previous nine Counts averred in the Amended Complaint states a claim upon which relief may be granted, the assertion of a claim for punitive damages, standing alone, fails.

## POINT II

### NEW YORK IS AN EXCEEDINGLY INCONVENIENT FORUM AND VENUE IS BETTER REPOSED IN ITALY

Substantially all of the material events averred in the Amended Complaint occurred in Italy, with witnesses and other evidentiary materials residing in Europe.  Plaintiff, Peracchino, is averred to be an Italian citizen domiciled in Italy. ¶3. Plaintiff, MP, is averred to be an Italian business entity with "a place of business" in Italy. ¶4 MP's business activities are conducted through "its press agency News Italia Press" located in Italy which "divulges news" "about" the "Italian world" made of Italians "who reside outside of Italy." ¶8.

The first meeting between Plaintiffs and Defendants was in Rome, Italy. ¶11  Plaintiffs do not aver that they ever came to

America, much less New York, to meet with Defendants.  The Italian Plaintiffs next contact is with Paolo Zinni in Milan, Italy, ¶¶11-12, where Zinni resided, followed by a meeting with Riccardo Piano at MP's office in Italy. ¶14  All monetary terms are expressed in Euros with all purportedly contemplated financial transactions occurring in Europe. ¶¶15-19, 21, 38, 41, 43 and 47.

The next physical contact averred was with Giovanni Vasapollo at MP's Italian offices, ¶24, followed by an event with Walter Toccafondi and Marra in Turin, Italy, where MP's employees were located.  ¶¶25-26, after which Toccafondi was "allegedly in a hospital in Germany ...". ¶27

Plaintiffs' averred business activities undertaking purportedly because of Defendants of renting bigger office space and having an executive, while not disclosed as to location, presumably occurred in Italy. ¶28

Plaintiffs' next contact is with Guiliano Michelucci and Michelucci's accountant in Milan, Italy, ¶¶29-30, which led to the involvement of Armandi Miccoli, who presumably was in Italy. ¶32

MP avers it decided to organize "an event in Monte Carlo, Europe ¶334, for which "financial institutions in the Republic of San Marino were involved,  ¶¶36-37, whereupon Plaintiffs met Sergio Lupi, presumably in Europe. ¶38   Thereafter, Plaintiffs met executives of an unnamed financial institution in San Marino. ¶41.  Someone named Silvia, who allegedly worked for a bank in San Marino, called Plaintiffs purportedly to trace the wire transfer and the balance of

checks were to be band delivered to Plaintiffs in San Marino. ¶43

Plaintiffs were forced to sell her family's properties in an undisclosed location, but presumably in Italy. Finally, a less expensive event was organized by Plaintiffs in Monte Carlo. ¶47

A fair reading of the Amended Complaint places all transactional events either in Italy, the principality of Monaco or the Republic of San Marino. Other than Defendants' domicile in New York and the general conclusory averments that Marra "was in New York" and was "daily informed of the status of the investments, the problem in receiving the funds, and the fact that Zinni had issued a personal check" ¶20, and that "Marra, from New York, was always aware of the situation and kept orchestrating schemes to the detriment of Plaintiffs", ¶33, New York has no nexus whatsoever to Plaintiffs' claims. The Amended Complaint does not aver that Defendants received any benefit in New York, (or anywhere else for that matter) from the events about which Plaintiffs claim. No visits, much less meetings, are averred to have occurred in New York or in fact the United States.

From the pleading, it is fair to presume that any documents, to the extent they exist, would be in the Italian or French language and located in Italy, San Marino and/or Monaco, given the jurisdictions which the Amended Complaint avers are involved. The first language of all the parties, including the Plaintiff, appears from the pleading to be presumptively, Italian. Given the fact that the averred unspecified injuries occurred apparently in Italy or Monaco, the locus of the complaint appears to be primarily in Italy,

the formation of any contracts appears to be Italy, San Marino or Monaco, it is unlikely that New York law applies to Plaintiffs' claims.[4]

Finally, the Amended Complaint permits a reasonable presumption that almost all of the potential witnesses are located either in Italy, Monaco or San Marina.  Marra, himself a native Italian whose first language is Italian, spends several months a year in Italy.

The evaluation of a motion to dismiss based upon <u>forum non conveniens</u> requires a three step analysis to

> ". . . ensure that the place where a trial
> is held is convenient, that is, the forum
> fits the needs and is suitable to the
> circumstances of the case."

<u>Pollux Holding Ltd. v. Chase Manhattan Bank</u>, 329 F.3d 64, 67 (2d Cir. 2003). That analysis includes:

1.    the degree of deference to accord plaintiffs' choice of forum;

2.    whether an adequate alternative forum exists; and

3.    the balance of private and public interest.

<u>Id</u>. at 70-71, 74-77.

When a foreign plaintiff sues in a United States Court the foreign plaintiff's selection of the forum is given less deference to the extent that the presumption of convenience is not as great.  <u>Id</u>.

---

[4]Defendants have used New York law on this motion to dismiss as the law of the forum for assessing whether the Amended Complaint states a claim upon which relief may be granted out of convenience and without knowing what law Plaintiffs intend to assert governs the various counts.

at 71.  Accord Acosta v. J.P. Morgan Chase & Co., 2007 WL689529 (S.D.
N.Y.) at p.4.  There can be no reasonable dispute that Italian courts
are well versed in commercial matters and would provide a suitable
forum for litigating the dispute.  The public and private interest
factors are outlined in Gulf Oil Corporation v. Gilbert, 330 U.S. 501,
508-509, include:

1.   the relative ease of access to sources of proof;

2.   convenience of willing witnesses;

3.   availability of compulsory process for obtaining the
     attendance of unwilling witnesses; and

4.   other practical problems that make trial easy, expeditious
     and inexpensive.

Given the minimal nexus to this jurisdiction of the
Plaintiffs' claim, Italy is a logical and certainly more convenient
forum than New York. The public interest factors lend no support to
keeping this action in New York.  Base Metal Trading S.A. v. Russian
Aluminium, 253 F.Supp.2d 681, 712 (S.D.N.Y., 2003).  In fact, New York
is so attenuated from Plaintiffs' claims and inconvenient for reasons
of the location of the witnesses and documents, the language of
witnesses and the law that governs the issues raised in Plaintiffs'
pleading, that this Court in the exercise of its discretion should
dismiss the Amended Complaint in its entirety on the condition that
Defendants submit to jurisdiction of an appropriate court in Italy.
Acosta v. J.P. Morgan Chase & Co., supra aff'g 2006 WL 229196
(S.D.N.Y.); Cf. Kirch v. Liberty Media Corp., supra at 404.

## CONCLUSION

For the foregoing reasons it is respectfully submitted that the Plaintiffs' Amended Complaint be dismissed and that the Defendants be granted such other and further relief as the Court deems just and proper.

Dated: New York, New York
      July 10, 2007

Yours, etc.,

KAYSER & REDFERN, LLP

By: _____/s/_____
LEO KAYSER, III (LK 3550)
Attorneys for Defendants
515 Madison Avenue, 30th Fl.
New York, NY 10022
212-935-5057

TO:
FRANCESCO DI PIETRO (FD 6383)
WUERSCH & GERING, LLP
100 Wall Street, 21st Fl.
New York, NY 10005
212-509-4716