# EXHIBIT A

Wuersch & Gering LLP
100 Wall Street, 21st Floor
New York, NY 10005
(212) 509-5050

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARIA MARGHERITA PERACCHINO, and
MEDIAPRESS S.R.L.,

                 Plaintiffs,

     -against-

VINCENZO MARRA and
JOHN DOE COMPANY,

                Defendants.
-------------------------------------------------------------X

**SECOND AMENDED
COMPLAINT**

     Plaintiffs, MARIA MARGHERITA PERACCHINO ("PERACCHINO") and

MEDIAPRESS S.R.L. ("MP"), through their undersigned attorneys, allege upon information and

belief as follows for their Second Amended Complaint against Defendants VINCENZO

MARRA ("MARRA") and JOHN DOE COMPANY:

## COMMON ALLEGATIONS

     1.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332

(2) because this action is between foreign parties, Plaintiffs, and citizens of the State of New

York, Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of

interest and costs.

     2.    Venue properly lies in this District because Defendants reside or do business in

this District.

3.      At all times herein mentioned, Peracchino was, and still is, an individual with an address at v. Vische 7, Candia Canavese, Italy.

4.      At all times herein mentioned, MP was, and still is, a business entity organized and existing under the laws of Italy with a place of business at v. Montechiaro 1, Barone Canavese, Italy.

5.      Upon information and belief, Marra is an individual and, at all times herein mentioned, was and still is residing in this District and was and still is conducting business in this District, at 232 Madison Avenue, New York, New York 10016.  Marra was and still is the controller, shareholder, officer and/or director of the John Doe Company ("John Doe").

6.      Upon information and belief, at all times herein mentioned, John Doe was, and still is, an entity existing under the laws of a State.  At all relevant times, John Doe was and still is conducting business within this District.

7.      Plaintiffs bring this action on their own behalf and as agents and/or trustees on behalf of and for the interest of all parties who may be or become interested in the said action, as their respective interests may ultimately appear, and Plaintiffs are entitled to maintain this action.

## FACTS

8.      Peracchino is a shareholder, officer and director of MP.  MP is a company which through its press agency News Italia Press ("NIP") divulges news of various nature to and about the "Italian world" which is made of Italians who reside outside of Italy, as well as Italian-Americans.  The news divulged by MP include news concerning, mostly, Italian businesses, politics, finance and other news of interest to the Italian world outside of Italy. MP divulges news to its readers in the United States, including New York, where a large portion of MP's readers is located.  MP's newsletters contain advertisements of business and people in the United

States, including New York. MP also organizes events for or in connection with the "Italian world." MP has been in business for over ten years.

9.      John Doe Company is an entity made of several individuals, as more fully set forth herein, among whom there is defendant Marra. Marra, the head of John Doe Company, is the one who dictates orders to the other associates or partners of John Doe Company. One or more of the businesses operated by Marra also involve communications and news to and about the Italian world in the U.S. Marra's business activities involve the Italian community in the U.S. and, especially, New York, where a large size of Italians overseas is located. Marra;s business activities also include divulging news about the Italian businesses, politics, finance and other news of interest to the Italian world outside of Italy. Marra's businesses also include organizing events for and in connection with the Italian world.

10.      Marra had indicated to me, in August 2004, that he also intended to conduct a business similar to the one of MP. Marra saw a good opportunity for himself.

11.      Marra masterminded, orchestrated and directed a complex scheme which involved people and entities with a specific role which at all relevant times appeared, disappeared and reappeared at their convenience and which, ultimately, nearly bankrupted and destroyed the Plaintiffs. Their moves and decisions were dictated by Marra.

12.      In 2004, MP was undergoing a project of renovation and restructuring which would enable MP to strengthen its position in Italy and in the U.S. markets. During this process, MP was considering various solutions, including bringing in investors who were willing to inject money in MP.

13.     Peracchino learned that Marra was apparently well connected in the business world of Italians overseas, and in particular in New York. Peracchino believed that involving someone like Marra in MP's business would be beneficial to Plaintiffs.

14.     Plaintiffs' problems with Defendants started on August 14, 2004 when Peracchino, individually and on behalf of MP, met with Marra in Rome, Italy, in order to discuss MP's project and, ultimately, propose to Marra to invest in MP. Marra showed lots of enthusiasm for this project since, he indicated, he was involved and just started something similar and it would be beneficial to join forces (Plaintiffs' experience, knowledge of the business and readers versus Marra's alleged connections and capability to invest). During the meeting, Plaintiffs proposed the following: (1) Marra's direct and personal investment in MP, and (2) that Marra find other investors in addition to himself, if he deemed it necessary or beneficial. After lengthy discussions concerning the terms of such investment, Marra indicated that he was interested in investing and suggested that Plaintiffs contact Paolo Zinni ("Zinni"). Marra indicated that Zinni was his financial consultant for the type of investment and that Zinni, on behalf of Marra, would be dealing with Plaintiffs in connection with the investment.

15.     Marra also suggested that Plaintiffs submit financial and corporate records of MP to Zinni to afford Zinni an opportunity to conduct due diligence before the investment. Marra specifically indicated that Zinni would examine the corporate and financial books of MP and determine whether and how Marra would invest. Zinni was Marra's agent and long-arm.

16.     Marra arranged for a meeting between Peracchino and Zinni at Zinni's Milan office. During the meeting with Zinni in September 2004, Zinni indicated that, in addition to the corporate and financial records, he wanted to review MP's business plan to better assess MP's future project.

4

17.    Peracchino, then, hired a business consultant to prepare a business plan to submit to Zinni. MP's business plan cost approximately $12,000. Plaintiffs submitted the business plan to Zinni. In so doing, MP exposed all confidential information and secrets to Marra.

18.    Thereafter, Peracchino and Zinni met several times to define the terms of the investment. During said meetings, Zinni insisted that Plaintiffs meet with Riccardo Piana ("Piana"), Zinni's marketing consultant. Marra approved. Piana then visited MP's offices, reviewed MP's services and their marketing needs, and concluded that MP's services were palatable both in Italy and the U.S. According to Piana, MP needed to spend some money to improve its marketing strategy, and MP's services in general, which Plaintiffs did. Piana requested that Plaintiffs pay him Euro 5,000 to commence marketing MP's services. Once Plaintiffs paid Piana, Piana disappeared.

19.    After review of MP's records and business plan, Marra, through Zinni, accepted to invest in MP. At the end of February or beginning of March 2005, Zinni informed Peracchino that he, on behalf of Marra, would wire, on or about April 10 or 11, 2005, Euros 150,000 (approximately $210,000) to Peracchino who, as a shareholder of MP, would then transfer the wired funds to MP as a shareholder's loan to the corporation (MP). These funds were in consideration of a loan to be repaid with interest by Plaintiffs within one year; the agreement also provided that Marra would have the option to forgo the loaned sum in exchange for 51% of MP.

20.    On or about April 11, 2005, Zinni confirmed that the funds had been wired. Notwithstanding Zinni's confirmation, since Plaintiffs had not received said funds, Plaintiffs requested that Zinni show them a copy of the wire transfer. On April 28, 2005, Zinni sent Plaintiffs an email allegedly attaching a copy of the wire transfer.

21.     Plaintiffs later found out that the wire transfer was never ordered and the receipt was a forgery.  When Plaintiffs showed a copy of the alleged wire transfer to the receiving bank, the receiving bank informed Plaintiffs that the wire transfer receipt was a forgery and that no funds were ever wired.  When Plaintiffs confronted Zinni, Zinni replied that his employee or agent had stolen the funds and left town.  Zinni then issued a personal check for Euro 150,000 to Peracchino.

22.     During this entire time, Marra participated in various conference calls with the Plaintiffs and kept reassuring Plaintiffs about the investment.  Marra was daily informed on the status of the investments in MP, the problems in receiving the funds, and the fact that Zinni had issued a personal check.  On several occasions, on the phone, in late Spring 2005, Marra commented that even if it was Zinni's personal check, it was really Marra's money and that it was he who was ultimately paying.

23.     When Plaintiffs attempted to deposit said check, they discovered that there were no funds in Zinni's accounts (and the check bounced).  Peracchino then explained to Marra that the check had bounced and Marra indicated that he would resolve the problem directly with Zinni and assured Plaintiffs, once again, that that the Zinni's episode was a simple mishap which he would resolve with him personally.  For further reassurance, Marra added that he would get more directly and personally involved in the investment to avoid other mistakes.

23.     Pursuant to his promise, Marra sent another of his financial advisors, Giovanni Vasapollo ("Vasapollo"), to MP's office to examine MP's records and business plan all over again.  After review and approval by Vasapollo, Marra introduced Plaintiffs to his partner, Walter Toccafondi ("Toccafondi"), indicating that he would also invest into MP.  Apparently,

Marra and Toccafondi were business partners in several ventures, including ventures engaged on activities similar to MP's business activities.

24.     In connection with this new proposed investment, Plaintiffs invited at their expense, Marra and Toccafondi to Turin, Italy, where Marra and Toccafondi met with MP's employees and executives.  A new investment formula was proposed to Plaintiffs who accepted. While in Turin, Marra announced to MP's employees that "that rest assured, after so many words, now our [Marra's and Toccafondi's] money is coming".  He assured Plaintiffs that the investment was a done deal and that he strongly believed in the project.

25.     The new formula was confirmed by Marra and accepted by Plaintiffs on several occasions both verbally and in writing.  Even though no formal contract was signed, the terms of the contract were set and accepted by the parties: a total of 250,000 Euro (approximately $330,000) was to be invested in MP. Of this amount, 100,000 Euro was to be injected by Marra as capital contribution; 100,000 Euro was to be loaned by Marra to MP (with repayment of the principal plus interests); and the balance was to be obtained by investors, including Toccafondi, and/or banks with the help of Marra.

26.     Thereafter, Plaintiffs were informed that a new problem occurred.  Toccafondi was allegedly in a hospital due to an attack of diabetes.  The new investment suddenly slowed down.

27.     In the meantime, relying on Marra's and Toccafondi's numerous assurances and promises that money was coming very soon, Plaintiffs commenced spending money (MP hired an executive and rented a bigger office space) with the knowledge, approval, and continuous assurance of Marra.  It was Marra who specifically invited Plaintiffs to arrange as soon as possible for the hiring of the executive, the renting of a bigger officer space, and in general the

set-up of a new commercial structure which would enable MP to strengthen its position on the market.

28.    Since Toccafondi was allegedly ill, Plaintiffs asked Marra to get involved personally also on behalf of Toccafondi. Marra indicated that he also was stuck in New York due to business reasons and suggested that Plaintiffs meet Giuliano Michelucci, another of his trusted representatives or associates. Allegedly, Michelucci, on Marra's behalf, would help speed up the process, including transferring the funds and executing agreements.

29.    Marra organized a meeting with Michelucci and his accountant at the office of said accountant in Milan, Italy, on or about November 2, 2005. Plaintiffs, much later, found out that Michelucci was Marra's "*fact totum*" and even driver.

30.    At the November meeting, Michelucci confirmed that he would conduct the investment deal on behalf of Marra. He also proposed that Plaintiffs involve Armando Miccoli, another businessman he trusted. Marra approved. Miccoli was supposed to be one of the investors for the remaining funds (50,000 Euro).

31.    Thereafter, even Miccoli suddenly disappeared after he had allegedly attempted to find additional potential investors. When Plaintiffs communicated to Marra that Miccoli had disappeared, Marra insisted that Plaintiffs continue working with Michelucci.

32.    In the meantime, MP decided to organize an event in Montecarlo, Europe, as part of MP's services. This event was going to give exposure to MP and raise money.

33.    In order to be able to pay for the cost of the event, MP, once again, was in need of an investor, especially since lots of MP's financial resources had been spent due to Marra and his entourage and Marra's money was not coming due to various excuses; Marra kept inventing new excuses to justify the delay in the transfer of funds. Marra kept assuring Plaintiffs.

34.     Again, Michelucci, on behalf of Marra, indicated that he would involve certain financial institutions, located in the Republic of San Marino, in the transaction, at least to obtain funds to pay for the event, while Marra's money was being transferred.

35.     Michelucci then assured Plaintiffs that said financial institutions were interested and that they would help MP with the cost of the event.  Relying on Michelucci's representations and Marra's approval (Marra was dealing with Plaintiffs almost on a daily basis), MP organized the event.

36.     In the meantime, Michelucci introduced Plaintiffs to Sergio Lupi ("Lupi"), an alleged accountant who "represented" one of said financial institutions. It was Lupi who called the organizers of the event to confirm that by no later than April 25, 2006, the financial institutions would wire the sum of Euro 320,000 (more than $400,000) to MP.  Once again, the terms of the investment were changed.

37.     Lupi then insisted that Plaintiffs cover the initial cost of the event, while the funds were forthcoming.  Relying on such assurances, Plaintiffs issued check and spent money to cover such initial costs.  Marra instructed Plaintiffs to keep going and not worry.

38.     The promised funds were never sent and the check issued by the Plaintiffs bounced for lack of funds in Plaintiffs' accounts.  Lupi suddenly disappeared.

39.     Michelucci was informed of the problem and, on or about May 17, 2006, he instructed Plaintiffs to contact the financial institution's executives.

40.     On May 18, 2006, Plaintiffs met with said executives in San Marino and were promised that the funds would be wired within 4 days.  Marra approved.

41.    Since again, no funds were received, on May 25, 2006, Plaintiffs informed Michelucci and Marra that if MP did not receive the funds immediately, the event would fall apart and MP would be bankrupt. Again, Marra assured the Plaintiffs.

42.    On May 26, a person named Silvia who allegedly worked for a bank in San Marino called Plaintiffs to communicate the details to trace three wire transfers (out of allegedly 5 transfers that Michelucci had promised to make). The three wires, allegedly amounted to a total of Euros 97,405 (equal to approximately $125,000). According to Michelucci, the balance (checks) would be handed to Plaintiffs at San Marino on May 27. However, Plaintiffs were never invited to San Marino on May 27. On May 29, 2007, Plaintiffs were informed that the three wire transfers did not exist and that the details that were communicated by Silvia did not exist.

43.    When Plaintiffs spoke with Michelucci, Michelucci insisted that the funds would come shortly, which they never did.

44.    To save MP from bankruptcy and the event, Peracchino was forced to sell her family's properties. This notwithstanding, the event fell apart, because Peracchino's money was not sufficient to cover all costs.

42.    In the meantime, MP organized a minor, less expensive, event in Monte Carlo to recuperate at least part of the money. In July and August 2006, Plaintiffs spent approximately Euro 150,000. At that point, Marra, having learned that Plaintiffs were virtually out of business, suddenly interrupted all communications with Plaintiffs.

43.    Marra, sitting in New York, was kept informed, by all people named herein, both verbally and in writing of all facts and events on a daily basis. Marra acknowledged, approved and ratified the actions of Zinni and all of his associates named herein. Marra was in New York

10

when he was informed by Plaintiffs and by his own associates and agents named in the complaint, and approved and ratified all actions. Marra's associates and agents kept Marra informed because they were conducting business in the name and on behalf of Marra. Even Plaintiffs kept Marra closely informed because Marra was Plaintiffs' "business partner". Marra was responsible of those actions and of the investments in MP because he was the one investing in MP. On a regular basis, Marra was receiving from and making calls to, as well as receiving and sending correspondence, Plaintiffs and all people named in the complaint. His actions and omissions were key to the complex scheme organized and masterminded by Marra.

44.    It is important to understand what kind of person Marra claimed to be. From the beginning, Marra claimed to be a successful businessman, a mogul. He also claimed to have numerous connections in the political and financial world of both the U.S. and Italy. Marra ostensibly made believe to be surrounded by a herd of financial advisors, accountants, and capitalists. On numerous occasions, Marra told Plaintiffs that he was very important in the Italian community of New York. Additionally, Marra befriended Peracchino and on numerous occasions both verbally and in writing, in business contexts, referred to her as his beloved friend. Marra had ulterior motives: since he, John Doe Company, and Plaintiffs were involved in the same or similar business, and therefore possible competitors, he wanted to destroy Plaintiffs. At the same time, Marra's goal was to obtain relevant, sensitive and very confidential financial, corporate, marketing and customer base documentation and information pertaining to Plaintiffs and use said documentation and information for his own advantage and for the advantage of John Doe Company, to the detriment of Plaintiffs.

45.    By reason of the foregoing, Plaintiffs have suffered damages in excess of

$1,000,000, including, but not limited to, damages to the core business and reputation of Plaintiffs which were on the verge of total collapse as well as investment opportunities which they missed because of Defendants.

**COUNT I**
**AS AND FOR A FIRST CAUSE**
**OF ACTION FOR BREACH OF CONTRACTS AS AGAINST**
**ALL DEFENDANTS**

46.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 45 of this complaint as if herein set forth at length.

47.    The offers of Defendants and the acceptances of Plaintiffs constitute valid contracts between the parties herein.  Plaintiffs performed their obligations while Defendants failed to perform their obligations.  Plaintiffs would have also performed the balance of their obligations for each contract (including paying off the loans and issue shares to Marra and/or his company), had Plaintiffs received the promised funds.  Defendants' failures to perform amount to breaches of contracts.  By reason of the foregoing, Plaintiffs suffered damages.

**COUNT II**
**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR PROMISSORY ESTOPPEL AS AGAINST**
**ALL DEFENDANTS**

48.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 45 of this Complaint as if herein set forth at length.

49.    Defendants made several clear and unambiguous promises to Plaintiffs (each promise was reiterated on numerous occasions by Defendants, including that the investment was a done deal).  Plaintiffs relied on each and every promise made to them by Defendants.  Their reliance was reasonable and foreseeable.  Defendants failed to keep their promises.  As a result of their reliance, Plaintiffs suffered damages.  Defendants urged Plaintiffs to act on Defendants'

promises. Plaintiffs, relying on each promise made to them by Defendants, acted. Plaintiffs kept asking for assurances by Defendants, which Defendants promptly provided. Plaintiffs did not know the true intentions of Defendants. Reasonably, given the circumstances described herein, Plaintiffs believed that Marra had controlled over all people named herein and John Doe Company. Defendants knew that Plaintiffs were acting based on their promises since each time they were put on notice by Plaintiffs. Defendants failed to keep their promises. Defendants' failures damaged the Plaintiffs. Had Plaintiffs known the true intentions of Defendants, they would not have acted based on the promises.

## COUNT III
## AS AND FOR A THIRD CAUSE OF ACTION
## FOR EQUITABLE ESTOPPEL AS AGAINST
## ALL DEFENDANTS

50.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 45 of this complaint as if herein set forth at length.

51.     Defendants made several promises to Plaintiffs (each promise was reiterated on numerous occasions by Defendants, including that the investment was a done deal). Defendants' promises and representations were false; Defendants also concealed facts (such as, their true intentions and the intentions of their associates and agents named herein, including the fact that the money they promised would never be paid). Defendants intended that Plaintiffs act on the representations and, in fact, urged intended Plaintiffs to act on Defendants' promises. Plaintiffs relied on each promise made to them by Defendants and acted. Plaintiffs kept asking for assurances by Defendants, which Defendants promptly provided. Plaintiffs did not know the true intentions of Defendants. Reasonably, given the circumstances described herein, Plaintiffs believed that Marra had controlled over all people named herein and John Doe Company. Defendants knew that Plaintiffs were acting based on their promises since each time they were

13

put on notice by Plaintiffs. Defendants failed to keep their promises. Defendants' failures

damaged the Plaintiffs. Had Plaintiffs known the true intentions of Defendants, they would not

have acted based on the promises.

## COUNT IV
## AS AND FOR A FOURTH CAUSE OF ACTION
## FOR FRAUD AS AGAINST ALL DEFENDANTS

52.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in

paragraphs 1 through 45 of this complaint as if herein set forth at length.

53.    Defendants made several fraudulent representations and promises, knowing them

to be false, to Plaintiffs with the intent to defraud them (the contents of which as more fully set

forth in the Facts section of this complaint). Plaintiffs justifiably relied on each promise made to

them by Defendants. Defendants failed to keep their promises. Defendants' failures damaged

the Plaintiffs. The representations and promises were made by Marra, individually and on behalf

of John Doe Company, on numerous occasions and almost on a daily basis, on the phone, while

Marra was in New York, in writing, and in person, directly and also through his associates and

agents, while in Italy where he met Plaintiffs in connection with the investment. Defendants had

duties to disclose the true facts to Plaintiffs. Additionally, the motive and opportunity are set

forth at length in paragraphs 44 and 45 herein.

## COUNT V
## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENTATION AS AGAINST ALL
## DEFENDANTS

54.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in

paragraphs 1 through 45 of this Complaint as if herein set forth at length.

55. Defendants made several false representations and promises to Plaintiffs knowing that Plaintiffs desired such representations and promises for the purpose of investing in MP and knowing (or at least they should have known) that the representations and promises were incorrect. Plaintiffs justifiably relied on each representation and promise made to them by Defendants. Defendants' failures damaged the Plaintiffs who had relied to their detriment. Plaintiff asked and were given repeated assurances by Defendants about each of the investments. Plaintiffs also provided Defendants with financial and corporate records. Plaintiffs needed the investments and Defendants knew it; Plaintiffs were dependant with respect to Defendants and their investments. Marra often referred to Peracchino as his beloved friend even in business contexts. All that creates a special relationship between and among the parties herein.

## COUNT VI
## AS AND FOR A SIXTH CAUSE OF ACTION FOR UNJUST ENRICHMENT AS AGAINST ALL DEFENDANTS

55. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 45 of this complaint as if herein set forth at length.

56. Defendants' actions and or omissions enriched Defendants. Defendants' enrichment was not justified. Defendants received benefits from Plaintiffs which they accepted, as more fully set forth in paragraphs 44 and 45 herein.

## COUNT VII
## AS AND FOR A SEVENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY AS AGAINST ALL DEFENDANTS

57. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 45 of this complaint as if herein set forth at length.

58. Defendants had superior knowledge respect to Plaintiffs of all facts and circumstances described herein. Defendants had a duty of care and loyalty to the Plaintiffs.

15

Defendants breached said duty with their actions and/or omissions. By reason of Defendants' breach, Plaintiffs suffered damages. Plaintiff asked and were given repeated assurances by Defendants about each of the investments. Plaintiffs also provided Defendants with financial and corporate records. Plaintiffs needed the investments and Defendants knew it; Plaintiffs were dependant with respect to Defendants and their investments. Marra often referred to Peracchino as his beloved friend even in business contexts. All that creates a special relationship between and among the parties herein and, in light of such relationship, Defendants owed a duty to Plaintiffs.

## COUNT VIII
## AS AND FOR A EIGHTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE AS AGAINST ALL DEFENDANTS

59.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 45 of this Complaint as if herein set forth at length.

60.    Plaintiffs had expectations of business advantages due to their long-lasting relations with clients, potential clients, and investors and potential investors who were seriously interested in investing in MP until Defendants interfered with Plaintiffs' relations. By reason of the foregoing, Plaintiffs suffered damages.

## COUNT IX
## AS AND FOR A TENTH CAUSE OF ACTION FOR PUNITIVE DAMAGES AS AGAINST ALL DEFENDANTS

61.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 60 of this Complaint as if herein set forth at length.

62.    Plaintiffs are entitled to recover punitive damages due to Defendants' willful and/or malicious actions and/or omissions. Defendants' conduct was repetitive and continuous

16

which makes their conduct even more despicable and subject to punitive damages. Defendants'

conduct not only caused monetary damages to the Plaintiffs but also drove the Plaintiffs to near

bankruptcy.

## **CONCLUSION**

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants on each and

every cause of action herein in an amount in excess of $1,000,000, plus interest, costs and fees of

this action, including but not limited to attorneys' fees, as well as such other and further relief

that this Court may deem just and proper.


Dated:  August 16, 2007
        New York, NY

                                    Wuersch & Gering, LLP
                                    Attorney for Plaintiffs

                                    By: _____
                                        Francesco Di Pietro (FD 6383)
                                        100 Wall Street, 21st Floor
                                        New York, New York 10005
                                        (212) 509-5050
                                        Our File:  11023-002